1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WILLIAM RAY PALMER, JR.,                    No.  2:11-cv-03426 GGH

12                    Petitioner,

13         v.                                    ORDER[1]

14   MATTHEW CATE,

15                    Respondent.

16   _____

17   *I. Introduction and Summary*

18         Petitioner brings his claims in an amended petition, which except for the addition of a

19   Brady/Napue claim, is identical to his original petition, which raised five claims.  The initial

20   petition raised propensity evidence claims (Claims 1 and 2), an unequal evidentiary treatment

21   claim (Claim 3), a claim contesting the interpretation of "traumatic evidence" under California

22   law posed as "insufficiency of evidence" (Claim 4), and a claim alleging failure to strike a strike

23   at sentencing along with disproportionate sentencing under the Eighth Amendment (Claim 5).

24   The additional, sixth claim posits that a prosecution witness was threatened by a state investigator

25   in order to compel her testimony (only recently discovered by petitioner), and that the witness

26   testified perjuriously.  This sixth claim is actually a combination of alleged Brady/Napue claims.

27   _____

28   [1] This case is a consent case before the undersigned pursuant to 28 U.S.C. 636(c).

For the reasons set forth in each section discretely dealing with petitioner's claims, the amended petition should be denied.  Further, the undersigned declines to order an evidentiary hearing on the witness compulsion/perjury claim.

*II. Substantive Facts*

The Court of Appeal issued a reasoned decision in petitioner's case, and that court's detailed factual presentation is presumed correct and adopted by the undersigned as follows:[2]

> The victim is defendant's wife.  The charges are based on defendant's conduct in March and April 2008.
>
> A. March 2008
>
> The victim testified at trial that she and defendant had argued over his intent to use her vehicle (which was their only means of transportation) when she needed it.  She ran to the vehicle and tried to climb into the driver's door in an effort to get the keys from defendant, who was already seated inside.  He pushed her out and tried to close the door, which slammed on her hand.  She thought this was an accident.  She fell on her own to the ground; he drove away.  She noticed that her neighbor was outside.  The police arrived in response to the call of a second neighbor.
>
> The victim had told the police at the time of incident that the argument began when she asked defendant to fill out divorce papers, leading to the fight over use of the vehicle.  She also told them there was an incident of domestic abuse about two to three weeks earlier in which defendant had punched her in the stomach.  At trial, the victim asserted that her statements to the police might have been a result of her lingering anger at defendant and consequently may have been colored unfavorably toward him.  She insisted defendant had never punched her in the stomach.
>
> The first neighbor testified that she had witnessed the incident, going to her front door when she heard the argument.  She was approaching the vehicle when she saw defendant pull his wife out of it.  The neighbor pointedly told defendant that it was his wife's vehicle, but he ignored her.  The neighbor saw defendant slam the door when the victim reached in to grab the keys.  She also saw defendant push his wife to the ground and curse at her before driving off.
>
> B. April 2008
>
> The victim testified at trial that she and defendant had an argument one evening, after which she left and stayed overnight with a friend.  When she came home the next day, they argued about the fact that

---

[2]  As will be seen, petitioner's insufficiency of the evidence claim is not an attack on the facts, but rather on the legal interpretation of those facts.

she had spent a night away from home. She believed that she may have told defendant that she wanted a divorce, because that was the subject of her arguments with him when angry. A friend of defendant, who was staying with them, was in the living room. She and defendant went into the bedroom while they continued to argue. As defendant was sitting on the bed, she attacked him. He put up a foot to block her, making contact with her thigh. He tried to leave the room, accidentally stepping on her foot. They wound up in the kitchen, where she dared him to slit her throat. He did not make any threat to slit her throat. They struggled over her purse; she was able to grab it from him and went to the second neighbor's home, where she phoned her mother and said she needed a ride. She did not ask her mother to call the police. The police, however, arrived in response to a call from the mother, and the victim spoke with them.

The second neighbor had told police at the time that the victim had said to her that defendant had kicked her very hard in the leg. The second neighbor, however, testified at trial that she had not spoken to any investigators and denied even having a phone. Although she claimed that she could not remember this particular incident occurring, she admitted the victim might have complained once about defendant kicking her in the leg.

The victim told the police at the time that defendant had hit her arm the night before, bruising it. In describing their present argument, she said defendant had kicked her thigh as she passed where he was sitting on the bed, which caused her to fall to the ground in pain. As she lay there, he came over to her and stomped on her foot. When they went into the kitchen, he threatened to slit her throat. She said she was very afraid of defendant, and would not even go outside to smoke because she saw him near the patrol car. She had not wanted to call them because she recently had discovered that she was pregnant and wanted to sort things out. At trial, the victim did not recall telling any of this to the police.

The victim's mother testified that she had received a call from the victim, who was crying and telling her that defendant had kicked her in the leg. The victim also told her mother that defendant had threatened to slit her throat. The mother decided to call the police. The victim admitted at trial that she possibly told her mother defendant had kicked her, but she had never told her mother that he had made a threat to slit her throat.

The sole defense witness was the friend staying with the victim and defendant at the time of the incident. He testified that from where he was sitting in the living room, he could see defendant sitting on the bed in the other room. He did not see defendant kick the victim or stomp on her. He did not hear any threat about slitting a throat. However, on the day of the incident, the friend had told police that he could not see what was happening in the bedroom during the fight.

/////

3

1

C. Other incidents

2

3

4

5

6

7

In addition to the victim's incidental references to other uncharged acts of domestic violence on defendant's part (i.e., the stomach punch and the bruised arm), her mother testified that the victim had told her about an occasion shortly after their marriage in which he knocked her to the ground while she was holding her young daughter and was pregnant with another child.  (The probation report indicated the victim had married defendant in 2006.)  The victim had also told her about defendant hitting her hard enough to crack her tooth, and to leave her crawling on the floor because she could not see to stand up; the victim's mother was not clear whether these were separate incidents.  The victim denied at trial that either of these incidents occurred.

8

9

10

The mother of defendant's two older sons testified that after the birth of their first child, defendant began to push her around and threaten to kill her.  There were "several" occasions on which he put his hands around her neck and squeezed it, or tried to smother her nose and mouth. She also testified about two specific instances.

11

12

13

14

In February 2001, on the day before she gave birth to their younger son, defendant shoved her to the ground of the garage with both hands.  Defendant then drove so recklessly with her and their one-year-old son in the truck, nearly flipping it, that she urinated in her pants.

15

16

17

18

19

20

21

22

23

24

In August 2001, she and defendant had recently ended their relationship.  She went to his parents' home with the children at his request, where they had an argument about her recent filing to obtain sole custody (in the course of which he also asserted his desire to have sex with her).  When she started to leave, defendant tried to wrest away the carrier with the children in it.  She was able to put the children in the car, but defendant slit the tires.   He threatened to kill her and began throwing objects at the car, including a sledge hammer that broke through the rear window.  He grabbed one child out of the car; she grabbed the other and followed him into the house.  He chased her around the house, assaulting her and trying to confine her in a bathroom.   The argument finally ended a couple of hours later when defendant announced that he was leaving.  She asked for the phone; he threw it on the floor. She called the police.  The prosecutor introduced photographs documenting the property damage and the injuries to the children's mother.   She asserted that she was still afraid of defendant, although she maintained contact with his parents and would occasionally see him there.

25

People v. Palmer, 2010 WL 2913046, *1-3 (Cal. App. 2010).

26

/////

27

/////

28

/////

4

1   *III. Procedural Facts*

2        On April 23, 2008, a complaint was filed against petitioner, alleging:  Count 1, Corporal

3   Injury to Spouse/Cohabitant, in violation of Cal. Penal Code[3] Section 273.5(a) [occurring on

4   April 21, 2008]; Count 2, Criminal Threats, in violation of Section 422 [occurring on April 21,

5   2008]; Enhancements for Multiple Convictions, in violation of Section 1170.12, involving a

6   conviction for Criminal Threats [occurring on October 26, 2000]; and, two Prior Felony

7   Enhancements, in violation of Section 667.5(b), for not remaining free of prison custody for a

8   five year term following conviction on October 26, 2000 for criminal threats and vehicle theft.

9        On the eve of trial, October 21, 2008, an Amended Consolidated Information was filed,

10  alleging: Count 1, Corporal Injury [occurring on April 21, 2008] with a Prior Conviction [for

11  Corporal Injury to a Spouse etc., occurring on September 27, 2001], in violation of Section

12  273.5(a) and (E); Count 2, Criminal Threats [occurring on April 21, 2008], which is a serious

13  felony; and, Count 3, Corporal Injury to Spouse etc. [occurring on March 21, 2008] with the same

14  prior conviction as alleged in Count 1.

15       Trial was held, and the jury convicted petitioner of all three counts of the amended

16  information.  After petitioner waived a jury trial on special allegations of the counts, the trial

17  court found them to be true.  Petitioner stipulated to the validity of a prior misdemeanor domestic

18  violence conviction occurring in 2001 and, prior to sentencing, the court refused to strike

19  petitioner's prior serious felony conviction.  Petitioner was ultimately sentenced to 17 years

20  comprised of consecutive terms.[4]

21       On appeal, decided on July 27, 2010, the Court of Appeal affirmed the verdict and

22  sentence with a modification of time credits earned.  On November 10, 2010, the petition for

23  review in the California Supreme Court was denied.  No petition for certiorari with the U.S.

24  Supreme Court was filed.  On December 15, 2011, the original federal petition in this case was

25

26  [3]  All statutes in this paragraph refer to the California Penal Code.

27  [4]  Count 1 resulted in a sentence of 4 years, doubled to 8 years by the prior serious felony.  Count 2 resulted in a sentence of 8 months, doubled to 16 months by the prior serious felony.  Count 3

28  resulted in a sentence of 16 months, doubled to 32 months with an additional 5 years for the prior serious felony.

1  filed.  Because the AEDPA limitations period did not commence running until 90 days after the

2  state supreme court decision, <u>Bowen v. Roe</u>, 188 F.3d 1157, 1158–59 (9th Cir. 1999), the initial

3  federal petition was timely filed.  However, there is an issue, discussed below, concerning

4  whether the sixth claim set forth in the amended petition was timely filed.

5  *IV.  Legal Standards*

6          The statutory limitations of federal courts' power to issue habeas corpus relief for persons

7  in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

8  Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16          As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

17  2254(d) does not require a state court to give reasons before its decision can be deemed to have

18  been 'adjudicated on the merits.'"  <u>Harrington v. Richter</u>, ___ U.S. ___, ___ 131 S. Ct. 770, 785

19  (2011).  Rather, "when a federal claim has been presented to a state court and the state court has

20  denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

21  absence of any indication or state-law procedural principles to the contrary."  <u>Id.</u> at 784-785,

22  citing <u>Harris v. Reed</u>, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits

23  determination when it is unclear whether a decision appearing to rest on federal grounds was

24  decided on another basis).  "The presumption may be overcome when there is reason to think

25  some other explanation for the state court's decision is more likely."  <u>Id.</u> at 785.

26          The Supreme Court has set forth the operative standard for federal habeas review of state

27  court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

28  application of federal law is different from an incorrect application of federal law.'"  <u>Id.</u> at 785,

6

1    citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000).  "A state court's

2    determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

3    jurists could disagree' on the correctness of the state court's decision."  Id. at 786, citing

4    Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

5        Accordingly, "a habeas court must determine what arguments or theories supported or . . .

6    could have supported[] the state court's decision; and then it must ask whether it is possible

7    fairminded jurists could disagree that those arguments or theories are inconsistent with the

8    holding in a prior decision of this Court."  Id.  "Evaluating whether a rule application was

9    unreasonable requires considering the rule's specificity.  The more general the rule, the more

10   leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the

11   stringency of this standard, which "stops short of imposing a complete bar of federal court

12   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

13   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

14   was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

15       The undersigned also finds that the same deference is paid to the factual determinations of

16   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

17   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

18   decision that was based on an unreasonable determination of the facts in light of the evidence

19   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

20   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

21   factual error must be so apparent that "fairminded jurists" examining the same record could not

22   abide by the state court factual determination.  A petitioner must show clearly and convincingly

23   that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

24   969 (2006).

25       The habeas corpus petitioner bears the burden of demonstrating the objectively

26   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

27   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

28   show that the state court's ruling on the claim being presented in federal court was so lacking in

1  justification that there was an error well understood and comprehended in existing law beyond

2  any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-787. "Clearly

3  established" law is law that has been "squarely addressed" by the United States Supreme Court.

4  Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743 (2008). Thus, extrapolations of settled

5  law to unique situations will not qualify as clearly established. See, e.g., Carey v. Musladin, 549

6  U.S. 70, 76, 127 S. Ct. 649 (2006) (established law not permitting state sponsored practices to

7  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

8  unnecessary showing of uniformed guards does not qualify as clearly established law when

9  spectators' conduct is the alleged cause of bias injection). The established Supreme Court

10  authority reviewed must be a pronouncement on constitutional principles, or other controlling

11  federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.

12  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362 (2002).

13  The state courts need not have cited to federal authority, or even have indicated awareness

14  of federal authority in arriving at their decision. Early, 537 U.S. at 8. Where the state courts have

15  not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will

16  independently review the record in adjudication of that issue. "Independent review of the record

17  is not de novo review of the constitutional issue, but rather, the only method by which we can

18  determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson,

19  336 F.3d 848, 853 (9th Cir. 2003).

20  Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA

21  deference is given; the issue is reviewed de novo under general principles of federal law. Stanley

22  v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011). However, when a state court decision on a

23  petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

24  habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

25  merits. Johnson v. Williams, ___ U.S. ___, ___, 133 S. Ct. 1088, 1091 (2013).

26  *V. Discussion*

27  As discussed above, petitioner's amended petition raises six claims, which will be

28  discussed in turn.

8

1        *A.  Claims 1 and 2: Propensity Evidence*

2            Citing the non-AEDPA case of <u>McKinney v. Rees</u>, 993 F.2d 1378 (9th Cir. 1993),

3    petitioner disputes that his previous spousal battery conviction and other incidents, and details

4    thereof, should have been permitted in his trial.  As the Court of Appeal described:

5                Before trial, the prosecution moved in limine to admit the incidents
             of uncharged domestic violence that we have detailed above.
6            Defense counsel moved to exclude only the facts underlying
             defendant's 2000 felony conviction for making criminal threats or
7            his 2001 misdemeanor conviction for domestic violence resulting
             from the August 2001 attack on the mother of his sons, or the fact
8            that the victim miscarried her fetus after the shoving incident to
             which her mother testified (which was the result of the umbilical
9            cord being wrapped around the fetus).

10               At the hearing, the prosecution indicated that it did not intend to
             make use of the facts underlying the conviction for criminal threats,
11           subject to the manner in which evidence developed at trial.  With
             respect to the mother of defendant's other children, the prosecutor
12           indicated there were more incidents than the August 2001 attack (in
             particular, the shoving and driving incident in February 2001, and
13           defendant's other assaults on her).  Defense counsel did not contest
             admissibility, but asserted undue prejudice from some of the details,
14           including the fact that the mother experienced premature labor after
             the February 2001 incident.  The court agreed to exclude evidence
15           of premature labor.  The court did not consider defendant's behavior
             to be particularly egregious during the August 2001 incident, and
16           admitted all the details to which defense counsel had objected (save
             the fact that they resulted in a misdemeanor conviction, to which
17           the parties later stipulated).

18               Turning to uncharged acts of domestic abuse involving the victim,
             the prosecutor agreed not to make any reference to the miscarriage
19           after the shoving incident.  Otherwise, defense counsel conceded
             that he could not frame an objection to the rest of the evidence.  He
20           believed they were minor.

21   <u>Palmer</u>, 2010 WL 2913046 at *4.

22           Petitioner made a number of arguments in state court based on a perceived error of state

23   law.  In his amended petition before this Court he primarily confines his argument (and properly

24   so) to the issue of whether admission of propensity evidence—evidence of past acts which tend to

25   make the trier of fact believe he is guilty of the charged offense based on those past acts—violates

26   the Due Process Clause.  However, the issue is constrained by AEDPA, and in that context the

27   Ninth Circuit (as opposed to the Ninth Circuit in the non-AEDPA <u>McKinney</u> case) has clearly

28   held that the Supreme Court has not found that the admission of propensity evidence offends the

1   federal Constitution.  See Alberni v. McDaniel, 458 F.3d 860, 864 (9th Cir. 2006) (recognizing

2   that the Supreme Court's reservation of the issue of propensity evidence as a due process

3   violation doomed petitioner's due process argument therein); see also Holley v. Yarborough, 568

4   F.3d 1091, 1101 (9th Cir. 2009); Mejia v. Garcia, 534 F.3d 1036, 1047 (9th Cir. 2008).  Because

5   violation of clearly established law as pronounced by the United States Supreme Court is the sine

6   qua non for an AEDPA violation, see Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir. 2002)

7   (habeas relief not warranted if due process violation not clearly established by the Supreme

8   Court), and such pronouncement is not available for the character/propensity evidence issue,

9   petitioner is left to claiming that the interpretation of California law by California courts was

10  wrong—itself a non-actionable claim in federal habeas.  Estelle v. McGuire, 502 U.S. 62, 71, 112,

11  S. Ct. 475 (1991).

12         Thus, because this habeas corpus case is controlled by the AEDPA, petitioner's first claim

13  regarding direct propensity evidence is not actionable.  Petitioner's second claim, which is the

14  ineffective assistance of counsel claim regarding the failure to object to the propensity evidence,

15  suffers the same fate.  To the extent that one can be ineffective counsel for failing to object to

16  state law errors, the California Court of Appeal rejected the argument that any state law

17  arguments were viable.  The Court of Appeal having so ruled, petitioner cannot argue here that

18  the state court was incorrect in its application of state law such that this court may independently

19  review the asserted state law errors.  Federal courts are bound on pronouncements of state law.

20  Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602 (2005).  By definition, counsel could not

21  have been ineffective for not objecting to evidence which conformed to state law.  To the extent

22  that the claim involves a federal due process propensity evidence claim, that issue has been

23  decided adversely to petitioner herein, and counsel could not have been ineffective for not

24  objecting (assuming he did not object) as the admission of propensity evidence is not error

25  cognizable in federal habeas corpus, at least not at present.

26         Petitioner also makes the claim that regardless of the admission of propensity evidence per

27  se, the details given concerning his prior convictions were so prejudicial as to violate due process.

28  Petitioner cannot meet the high bar necessary for this claim.

1    Again, in Estelle v. McGuire, supra, the Supreme Court held that the fact that an

2    admission of evidence might violate state law is clearly insufficient in itself to establish a

3    violation of the Due Process Clause.  Thus, petitioner's contention that the prior bad act evidence

4    was described in such prejudicial detail in violation of Cal. Evidence Code Section 352 is not

5    cognizable.  Rather the admission must result in a situation so fundamentally unfair that any

6    reasonable jurist would recognize the substantial undue prejudice which accrued as a result of

7    such evidence.  Perry v. New Hampshire, ___ U.S. ___, ___, 132 S. Ct. 716, 723 (2012) ("so

8    extremely unfair that its admission violates fundamental concepts of justice").

9    The first category of other incidents comprises of previous assaults on the victim, denied

10   by her at trial, but nevertheless corroborated by the victim's mother at trial.  The prosecutor

11   started out asking the victim whether she had told her mother about certain incidents occurring

12   prior to the incidents with which petitioner as charged.[5]  The prosecutor questioned the victim

13   concerning incidents where petitioner: shoved her down while she was holding her little girl;

14   shoved her down while she was 4-5 months pregnant; backhanded her and either chipped or

15   loosened a tooth; backhanded her in the hallway and hit her so hard she had to crawl because she

16   couldn't see.  RT 111-112.  The victim's mother testified that the incidents did happen and with a

17   just a bit more detail.  RT 183- 184.

18   The second category of prior incidents were testified to by the mother of petitioner's sons

19   from petitioner's previous relationship, Katherine Matthews a.k.a. Somers.  She testified that

20   petitioner:  threated her life; choked her and covered her nose so she could not breathe; and,

21   generally smacked her now and then.  RT 229-32.  Specifically, she testified to incidents

22   occurring on February 25, 2001 and around August 2001.  On that day in February she was seven

23   months pregnant and petitioner shoved her down to a concrete floor.  Also, she and petitioner

24   were driving in a truck that petitioner kept trying to flip.  When recalling the incident in the truck

25   during her testimony, Ms. Matthews stated, "I remember being scared enough that I peed my

26   _____

27   [5]  No objections were made by defense counsel at trial concerning the form of the questions, or
     whether "telling her mother," without a foundational question as to whether such activity actually
     occurred, was relevant.  The prosecutor did ultimately ask whether these activities by petitioner
28   did happen.  The victim would either not recall or deny that the activity occurred.

1   pants, actually." RT 235. The baby was born the next day, over a month premature. The

2   prosecutor then asked about an incident occurring in or about August 2001, after the pair had split

3   up. RT 236-245. Angry that she was leaving him, petitioner got into an argument about her

4   leaving and "taking the kids." The argument began at his parents' house and escalated to the

5   point where petitioner would not let her leave, slashed her tire, threw objects at her car, and

6   threatened to kill her. He also hurled a sledge hammer through the rear windshield, proximate to

7   the car seat where her youngest son was. Petitioner then took the youngest son, went into the

8   house, and ran from room to room refusing to give the boy back. Then, "[h]e grabbed a hold of

9   [Ms. Matthews] and threw [her] on the bed a few times, he threw [her] to the ground, he slammed

10  [her] up against the walls, he pushed [her] into the bathroom and held the door closed so [she]

11  couldn't get out. So he had the kids in the living room and [she'd] be pulling on the door, and

12  he'd be making comments, see, your (sic) never going to go." RT 244.

13       The prior incident evidence was overdone in the context of the charges against petitioner

14  with some of the more graphic evidence being presented by Ms. Matthews over a considerable

15  part of her testimony. Indeed, the Matthews' testimony presented more egregious facts than those

16  of the charged events. Added to that was the less graphic testimony of the victim's mother. One

17  could not fault petitioner for forgetting, for a while, just what was supposed to be the focus of the

18  trial. Yet, the undersigned cannot find that the admission of the details of the other act evidence

19  was so prejudicial that it infected the entirety of the convictions. There existed contemporaneous

20  and sufficient evidence of the commission of the charged crimes both from the event-day

21  admissions of the victim at the time and the testimony of the neighbor and police officers who

22  investigated the crimes. Without much defense evidence to the contrary, the direct, on-point

23  evidence pretty much sealed the convictions. The recanting at trial of much of her on-the-scene

24  admissions made the victim's trial testimony appear transparently contrived— "forgetting" what

25  happened or spinning an event into an innocent mistake. In that respect, the recantations were

26  damning. The undersigned cannot find that the convictions here would have necessarily rested

27  upon the graphic prior act evidence, although if there had been much doubt, the prior act evidence

28  might well have put the matter "over the top" for the jury. Whether viewed from the due process

1    or ineffective assistance prism, the prejudice stemming from the detailed other act evidence was

2    not substantial enough given the facts of this case.

3           For the aforementioned reasons, petitioner's first and second claims are denied.

4           *B.  Claim 3: It Was Unfair, i.e., a Violation of Due Process, For the Trial Court To Have*

5    *Precluded Past Act Evidence Pertinent to the Witnesses Who Testified Against the Defense*

6           The old axiom that what is "fair for the goose is fair for the gander" comes to mind for

7    this claim.  Petitioner decries the facts that he was fair game for past act evidence, but for the

8    adverse witness, past bad act evidence was withheld from the jury.  There is an element of fair

9    play at work in this argument.  The Court of Appeal addressed this issue as follows:

10               Before trial, defense counsel had sought permission to impeach the
     first neighbor with a 1995 conviction for felony welfare fraud,
11               based on a complaint filed in 1991 relating to conduct ending in
     1990.  The trial court found the offense to be de minimus, in that it
12               ordinarily would have been the subject of a misdemeanor
     prosecution rather than a felony, and was too remote. It therefore
13               ruled the conviction was not admissible.

14               Defendant contends the exclusion of this evidence FN3 as remote
     was arbitrary and capricious in light of the trial court's other rulings
15               admitting the prior convictions of defendant and his witness for
     impeachment, and resulted in a fundamentally unfair trial that
16               violated his right to due process.  We disagree.

17                    FN3.  Defendant also purports to challenge the exclusion of
          evidence of a "petty theft as an infraction in 2000."
18                    However, defense counsel expressly abjured any interest in
          using anything other than the conviction for welfare fraud
19                    for impeachment, and therefore did not ask the trial court to
          rule on the question.  The issue consequently is forfeited on
20                    appeal.  ( People v. McPeters (1992) 2 Cal.4th 1148, 1179.)

21               The exclusion of the neighbor's 1995 felony conviction for welfare
     fraud (which in turn was based on conduct predating the 1991
22               complaint in the matter) as de minimus and too remote was not
     outside the bounds of reason.  (E.g., People v. Pitts (1990 223
23               Cal.App.3d 1547, 1554 [upholding trial court's rule of thumb
     presumption excluding convictions older than 10 years absent
24               unusual circumstances].)  The court's contrary ruling regarding
     prior convictions of defendant and the defense witness does not
25               demonstrate a latent arbitrariness.  As we detail more fully in the
     next part of the Discussion, defendant's felony conviction in 1996 is
26               the first of four in the course of an almost nonstop 13-year period of
     new offenses and violations of probation or parole.   (Since
27               defendant chose not to testify, the jury ultimately learned only of
     the 2001 misdemeanor conviction for spousal abuse, in order to
28               prove the charge of spousal abuse by a repeat offender).   The

                                               13

defense witness also had a string of six felony convictions, starting with a 1992 unlawful possession of an assault weapon and ending with a 2001 conviction for being an accessory to an unspecified felony that involved controlled substances.  As neither defendant nor the defense witness had led legally blameless lives after incurring these convictions in the mid-1990s (e.g., People v.. Campbell (1994) 23 Cal.App.4th 1488, 1496-1497 [allowing impeachment with otherwise remote prior conviction] ), the trial court could rationally distinguish between the neighbor's situation and theirs without being arbitrary.

As defendant failed to establish any error in the court's evidentiary rulings, we do not need to consider the question of prejudice from the exclusion or admission of the impeachment evidence.  As for his claim of a violation of his right to due process, the court's particularized exercise of discretion in each instance in a reasonable manner does not trample his constitutional rights.  ( People v. Fudge (1994) 7 Cal.4th 1075, 1102-1103; People v. Cudjo (1993) 6 Cal.4th 585, 611 [reasonable exercise of trial court's discretion under ordinary rules of evidence does not impermissibly infringe on right to present a defense, nor is any error of federal constitutional magnitude absent deprivation of material evidence for arbitrary reasons].)  We therefore reject this argument.

Palmer, 2010 WL 2913046 at *6.

The undersigned has some difficulty with the rational of the state court with respect to the de minimis nature of the welfare fraud committed by the prosecution witness.  Assuming that such an offense is ordinarily treated as a misdemeanor, it stands to reason that some aspect of the offense took it into more egregious territory—at least when it was prosecuted.  Moreover, since the offense would necessarily be pertinent to the honesty of the witness, the offense is generally more pertinent for impeachment than a non-fraud type of offense.  People v. Castro, 38 Cal. 3d 301, 313-315 (1985) ("Obviously it is easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a 'bad character' and "general readiness to do evil'").

The Court of Appeal's rationale concerning the unequal treatment is also somewhat problematic.  According to the appellate court, if an otherwise remote prior conviction is accompanied by a serious conviction record, the prior conviction used for impeachment, or even for propensity reasons, is not too remote.  However, if the prior conviction, even one very relevant to truthfulness, is not accompanied by a string of convictions, it is too remote.  The case cited by the Court of Appeal does stand for that proposition, see People v. Campbell, 23 Cal.

14

App. 4th 1488, 1496-97 (1994), but the case also emphasizes that the otherwise remote prior was admissible for credibility purposes because of its dishonest nature. Indeed, in this case, the prior conviction excluded (fraud) was much more relevant as to truthfulness than the other sundry drug and assault prior convictions suffered by the defendant and defense witness.

Nevertheless, under AEDPA standards, while reasonable minds could argue with the logic of the state court, it cannot be said that the state court decisions were such that "fairminded jurists" would have necessarily permitted the impeachment evidence. The use of a conviction record to value the admissibility of a prior conviction is not so arbitrary as to be completely illogical. Therefore, petitioner's third claim is denied.

*C. Claim 4: The Injuries Suffered by the Victim Do Not Qualify As Traumatic Injuries*

Under California law, the domestic abuse charges against petitioner must have been accompanied by traumatic injuries.[6] The Court of Appeal discussed this claim:

> Unlike other statutes requiring the infliction of serious or great bodily injury, the "traumatic condition" that must be the result of a defendant's infliction of corporal injury on a spouse can be only minor, as long as there is an abnormal change in the victim's body (such as a wound, or some other external or internal injury). (People v. Beasley (2003) 105 Cal.App.4th 1078, 1085-1086 [bruise sufficient, pain alone is not]; People v. Abrego (1993) 21 Cal.App.4th 133, 137-138 [pain or tenderness not sufficient]; People v. Gutierrez (1985) 171 Cal.App.3d 944, 952 [instruction properly defines traumatic condition to include minor injuries].)

> In the March incident, the hand of the victim was bruised for several days after defendant shut the car door on it, she had an abrasion on her elbow, and she had a scratch on her breast from the struggle with defendant. The responding officer and the victim's mother observed these injuries. In the April incident, the police and the mother observed a small, painful raised welt on the victim's leg where defendant had kicked it, a swelling on her foot where he had stomped on it, and a scratch on her knee. Given that even a bruise qualifies under the statute, we do not find persuasive defendant's largely ipse dixit assertion that these physical manifestations of the force he applied to the person of the victim are insufficient evidence. It is not necessary, as his description of the facts seems to suggest, that the injury either caused an impairment of function or required medical attention. We reject the argument.

---

[6] Cal. Penal Code section 273.5 provides in pertinent part that "[a]ny person who willfully inflicts [upon family members] . . . corporal injury resulting in a traumatic condition is guilty of a felony" and that "'traumatic condition' means a condition of the body, such as a wound . . . whether of a minor or serious nature." Cal. Penal Code § 273.5(a) and (c).

1    Palmer, 2010 WL 2913046 at *3-4.

2            The undersigned has searched in vain for petitioner's argument that the injuries described

3    by the Court of Appeal did not occur.  Rather, instead of contesting the fact of the asserted

4    injuries, petitioner argues, as he did before the Court of Appeal, that they are too de minimis to

5    qualify as "traumatic injuries."  This is not a sufficiency of the evidence argument; it is simply an

6    assertion that the Court of Appeal misinterpreted California law.  Petitioner's attack on the state

7    courts' interpretation of state law is not cognizable in federal habeas corpus.  Bradshaw v.

8    Richey, 546 U.S. 74, 76, 126 S. Ct. 602 (2005).  Therefore, petitioner's fourth claim is denied.

9            *D. Claim 5: The Seventeen Year Sentence Here Violates the Eighth Amendment*

10           Petitioner's argument here is twofold: (1) that the state courts erred in not striking a prior

11   conviction for purposes of application of California "strikes" law, and (2) that the resulting

12   sentence violated the Eighth Amendment proscription of cruel and unusual punishment.  The first

13   contention is yet another attack on the application of state law, not reviewable herein, and the

14   second fails on its merits.

15           Petitioner asserts that the trial court abused its discretion in not "striking a strike" which

16   would have made petitioner ineligible for the life term which was imposed.  Of course, this is not

17   the proper issue in federal habeas as the state court's application of state law cannot be reviewed

18   in federal habeas except under the most arbitrary of bases for its application.  Bradshaw v.

19   Richey, supra.  Also, no provision of the Constitution speaks to any right to have a prior

20   conviction not considered in sentencing.  See Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.

21   Ct. 2348 (2000).  Thus, the federal issue, and only issue reviewable here, if it had been exhausted

22   before the California Supreme Court, is one of disproportionate sentencing under the Eighth

23   Amendment.  See Crosby v. Schwartz, 678 F.3d 784, 791-92 (9th Cir. 2012); Gonzalez v.

24   Duncan, 551 F.3d 875 (9th Cir. 2008) (a case in which the state trial court had refused to "strike a

25   strike" pursuant to a Romero motion).

26           The undersigned further disagrees with petitioner on the merits.[7]  Under federal law as

27   _____

28   [7]  There is some question whether AEDPA review applies to this claim in that the Court of
     Appeal did not expressly address the Eighth Amendment claim.  However, the standard of review

established by the Supreme Court, a finding that a sentence is barred by Eighth Amendment

proportionality review is one that is "exceedingly rare" or "extreme." Lockyer v. Andrade, 538

U.S. 63, 73, 123 S. Ct. 1166 (2003).  The Supreme Court has set forth the factors to be

considered.

> [In Harmelin v. Michigan, 501 U.S. 957, 994, 111 S.Ct. 2680
> (1993),] Justice KENNEDY, joined by two other Members of the
> Court, concurred in part and concurred in the judgment.  Justice
> KENNEDY specifically recognized that "[t]he Eighth Amendment
> proportionality principle also applies to noncapital sentences."  Id.,
> at 997, 111 S.Ct. 2680.  He then identified four principles of
> proportionality review-"the primacy of the legislature, the variety of
> legitimate penological schemes, the nature of our federal system,
> and the requirement that proportionality review be guided by
> objective factors"-that "inform the final one: The Eighth
> Amendment does not require strict proportionality between crime
> and sentence.  Rather, it forbids only extreme sentences that are
> 'grossly disproportionate' to the crime." Id., at 1001, 111 S.Ct.
> 2680 (citing Solem, supra, at 288, 103 S.Ct. 3001).  Justice
> KENNEDY's concurrence also stated that Solem "did not mandate"
> comparative analysis "within and between jurisdictions."  501 U.S.,
> at 1004-1005, 111 S.Ct. 2680.
>
> The proportionality principles in our cases distilled in Justice
> KENNEDY's concurrence guide our application of the Eighth
> Amendment in the new context that we are called upon to consider.

Ewing v. California, 538 U.S. 11, 23-24, 123 S. Ct. 1170 (2003).

Of course, a defendant's recidivism can play a large role in determining whether a

sentence is disproportionate.  "Nothing in the Eighth Amendment prohibits California from

making that choice.  To the contrary, our cases establish that States have a valid interest in

deterring and segregating habitual criminals."  Id. at 25 (citation and internal quotation marks

omitted).  Thus, in Ewing's case, his shoplifting wobbler was viewed in the context of his prior

record: three burglary convictions and one robbery conviction.  His 25 years to life "three strikes"

sentence was therefore not viewed as disproportionate.  In Andrade, 538 U.S. 63, a case whose

underlying crime involved the stealing of goods worth about $150, it was not a violation of the

Eighth Amendment for Andrade to be sentenced to 25 years to life in light of his previous,

extensive burglary and drug convictions.

---

is not of importance here.  Even if the review is de novo, petitioner's claim herein fails.

1        Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004), illustrates when a sentence may be

2    viewed as grossly disproportionate.  The defendant in that case was charged with felony petty

3    thievery for a theft of less than $200 in value in part because of two felony, but when viewed on

4    their facts rather de minimis, prior shoplifting convictions.  However, these previous convictions

5    were also used as priors to enhance the defendant's sentence to 25 years to life under the Three

6    Strikes law.  The Ninth Circuit found that application of the Three Strikes law for what it

7    considered essentially minor, non-violent offenses to be grossly disproportionate.  Nonetheless,

8    petitioner's case has nothing in common with the Ramirez case.

9        First, this is no shoplifting case.  Petitioner was convicted of two counts of spousal

10   battery with injury, and one count of criminal threats.  The crimes here were serious.

11       Petitioner had a long and troubled criminal history at the time of sentencing.  Some of that

12   history has been addressed in previous claims.  Petitioner's conviction record demonstrates a

13   continuous inability to conform his conduct to the law, and as respondent notes, petitioner had a

14   penchant for threatening/beating women, even pregnant women; he was convicted of threatening

15   his mother.  His felony conviction record is as follows:

16       5/1/95: (Juvenile) Cal. Penal Code section 597(a)—Cruelty to animals.

17       8/20/96: Cal.Penal Code 484 (g)—(now 484e[8])—theft by improper credit card access.

18       12/27/96: Cal Penal Code 4532(b)—Escape.

19       12/06/00: Cal. Penal Code 422—Criminal threats (threats made to his mother).

20       9/27/01: Cal. Penal Code 12021(a)(1)—(now 29800 et seq)—felon in possession of a

21       firearm.

22   CT 210, 236

23   In addition, petitioner had numerous misdemeanor convictions, including at least one involving

24   domestic violence.  Petitioner had no less than seven probation or parole violations, many of

25   which incurred additional prison time.  Id.

26

27   [8]  The California Penal Code is in constant flux of additions, amendments, repeals, renumbering
     and the like, making it very difficult to trace the statutes allegedly giving rise to criminal offenses
28   committed some years ago.

1     Nor is this a three strikes case—it is a one strike case.  Thus, petitioner did not receive an

2     indeterminate life sentence.  His total sentence was 17 years.  Under the terms of the "Three

3     Strikes Law," a person with one strike receives a five year enhancement on whatever sentence the

4     court determines for the underlying crime.  Cal. Penal Code § 667(a)(1).  One five-year

5     enhancement was imposed.  Petitioner's basic sentence under state law for each count was also

6     doubled because of the existence of the prior serious felony.  Consecutive sentences were then

7     imposed.

8     Given the nature of the charges and the long recidivist history, it simply cannot be said

9     that the state courts unreasonably applied established Supreme Court authority.  Far from it.  The

10     17 year sentence was well within any reasonable parameters.  Thus, petitioner's fifth claim is

11     denied.

12     *E.  Claim 6: Alleged Improper Witness Coercion*

13     Approximately one and one-half years after filing the petition in this case, petitioner

14     sought leave to exhaust a new claim involving alleged witness coercion occasioned by the district

15     attorney's investigator who pressured a purportedly recalcitrant prosecution witness into

16     testifying adverse to petitioner.  The witness was Ms. Matthews, whose testimony about her

17     violent past with petitioner has been described in detail above.  In sum, this witness gave

18     testimony specifically recounting the acts of violence perpetrated on her by petitioner both when

19     and after living together.  As determined above, this witness testimony was prejudicial in its

20     detail, but not to the point of being so unfair that its presentation constituted a due process

21     violation.

22     On February 3, 2012, petitioner's mother, Sandra Palmer, filed a declaration which is

23     based on her hearsay conversation with Justin Matthews, the present husband of witness Ms.

24     Matthews.  According to Ms. Palmer, both Mr. and Ms. Matthews desired that petitioner put a

25     stop to these present habeas proceedings, inferring that these present habeas proceedings might

26     divulge in ongoing criminal proceedings against Ms. Matthews for lying during her testimony in

27     court during petitioner's trial.  Mr. Matthews related that if Petitioner would stop his habeas

28     proceedings and sign over petitioner's parental rights, "that in return, Justin Matthews and his

19

wife Katherine would 'help Billy (Petitioner) out by signing off on all back child support owed

and pay off all his restitution.'"  ECF No. 14, Palmer Declaration, at para. 4 (emphasis in

original).

Moreover, but only tangentially related to this inferred motivation, Ms. Palmer recounts

that Mr. Matthews told her:

> [B]ack in 2008, that the Shasta County DA's investigator, "Don,"
> appeared at their [the Matthews'] residence.  Don interred [sic,
> entered] the Matthews' house and began discussing with Katherine
> Matthews the People's case against Petitioner, and requested that
> Katherine testify for the prosecution in the case.  Justin told
> Declarant that Katherine Matthews told Don that she did not want
> to testify.  Just [sic, Justin] Matthews said that Don threatened
> Katherine Matthews that if she refused to testify against Petitioner,
> that "Katherine would go to prison for three years for perjury
> regarding prior statements she had made to police in 2000/2001,
> and for violation of probation in regards to related drug charges that
> Katherine and Petitioner were charge of [sic] in separate cases, ) of
> which Petitioner had already served time for on his charges).

> On January 12, 2012, Justin Matthews told Declarant that, he knew
> that certain details of Katherine Matthews' prior felonies for drug
> sales were intentionally undisclosed by the prosecution at
> Petitioner's jury trial in the instant case.

ECF No. 14 at paras. 5 and 6.

Petitioner sought leave to stay the case and exhaust his new claim which is a combination

Brady/Napue claim.[9]  A stay was entered and petitioner did exhaust his claim, receiving a

summary denial from the California Supreme Court.  Petitioner does not relate that he filed any

documentary evidence in the exhaustion process outside of the Sandra Palmer declaration, and the

undersigned will assume that the record before the state supreme court is the same as before the

undersigned.  On October 25, 2012, petitioner filed a notice that he had completed exhaustion and

also filed a First Amended Petition adding the now exhausted claim to his previous arguments.

/////

---

[9]  Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963) (failure of prosecution to disclose exculpatory, material evidence, including material impeachment evidence); Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173 (1959) (failure of prosecution to preclude perjurious testimony from being introduced).  Respondent recognizes only the Brady claim, but petitioner does complain that the Matthews testimony was perjurious as well.

1    Respondent filed a supplemental answer on December 31, 2012, with respect to this new

2    claim arguing that the claim should be dismissed/denied on several grounds: (a) statute of

3    limitations; (b) the claim presented to the state supreme court and this court was based entirely on

4    hearsay; and (c) assuming the truth of the hearsay, the asserted "failure to disclose" was not

5    material.  Petitioner filed a traverse on February 19, 2013, positing argument against the issues

6    raised by respondent, but no new evidence.

7            *1. Hearsay*

8            The undersigned first takes on the hearsay issue, as it is not important to the outcome of

9    this adjudication.  It is true, as petitioner asserts, that some of the Palmer declaration is not

10   hearsay as the revealed present motivation of Mr. Matthews, i.e., to "buy" parental rights in

11   exchange for petitioner abdicating these habeas proceedings, could conceivably be considered a

12   statement against penal interest.  Ms. Palmer's then asserted inference that the Matthews are

13   doing this so as to not prejudice then ongoing criminal proceedings against them is not hearsay,

14   but merely a conclusion of the declarant.  However, the evidentiary gist of the claim,

15   conversations between Don and Ms. Matthews, quoted above, is most assuredly hearsay, as that

16   recitation may, or may not, have anything to with Mr. Matthews' presently problematic

17   motivation.

18           But the undersigned need not be detained with an evidentiary treatise on hearsay because,

19   absent the considerations on the merits and evidentiary hearing preclusions discussed below, the

20   hearsay could warrant discovery and an evidentiary hearing.  If that occurred the hearsay problem

21   would be solved, and Ms. Matthews' would be able to testify, or not, to what Ms. Palmer alleges.

22           *2. Statute of Limitations*

23           Turning to the statute of limitations issue, respondent cites to the only case that need be

24   considered, Ford v. Gonzalez, 683 F3d 1230 (9th Cir. 2012), which is factually similar to the one

25   at bar, but distinguishable in important ways.  In Ford,[10] petitioner made a belated Brady claim

26

27   _____

     [10]  The undersigned adjudicated the case in the district court prior to the adoption of the Findings
     and Recommendations, in part, by the district judge.  Petitioner Ford also made an actual
28   innocence claim which was rejected by the district judge on the merits.

alleging that an important prosecution witness had her criminal history, and deals associated therewith, withheld by the prosecutor.  The petitioner in that case sought to have the claim not time barred because, he alleged, that there was no way he could have known of the prosecutor's alleged deceit.  The majority found that not only was petitioner (and his counsel) on notice at trial that the witness, Goins, had a very checkered criminal history, but also that the specter of plea deals, although perhaps not all specifics of the plea deals, were known to the defense.  These supposed deals could have been the subject of inquiry by the defense at the time of trial.  Just as importantly, the majority also found that the unique living arrangements of the witness—living with the wife of the defendant who was taking an active role in the defendant's case—was a resource which should, and could, have been cultivated to ascertain the alleged, impeaching information with respect to Goins given everyone's knowledge of Goins' criminal history and the fact that she would testify.  Petitioner Ford was held to have not exercised the proper diligence to unearth his Brady claim prior to the expiration of the AEDPA statute of limitations.

No one disputes here that petitioner's Brady/Napue claim would be time barred absent a finding that the factual predicate of petitioner's claim could not have been discovered until Ms. Palmer's conversation with Mr. Matthews.  See 28 U.S.C. § 2144(d)(1)(D).  Petitioner's conviction was final for AEDPA purposes on February 9, 2011, 90 days after the state supreme court denied review in the underlying criminal case.  Although the initial petition in this federal case was timely filed, petitioner did not seek a stay for exhaustion purposes on his Brady/Napue until May 2, 2012.  Also, there were no initial state habeas proceedings which would have tolled the limitations period.  Thus, the new claims presented for the first time in the request to seek a stay, and assuming the request to stay and not the stay itself as the appropriate time to commence tolling for the added claims which in no way relate back to the claims of the original petition, were untimely by approximately three months pursuant to section 2144(d)(1).[11]

/////

_____

[11]  This is *not* a case where the unexhausted, new claim was presented in the initial petition, and a Rhines stay would toll the statute of limitations for the unexhausted, new claim commencing with the filing of the petition.

1    The key issue here, therefore, as it was in <u>Ford</u>, concerns whether petitioner herein

2  exercised due diligence in "finding out" the alleged misconduct of the district attorney

3  investigator in allegedly coercing a witness to testify, and any plea deals/favorable treatment

4  associated therewith.  Petitioner's diligence is an open question with respect to the <u>Brady</u> claim,

5  but the <u>Napue</u> claim is barred by the limitations statute.

6    The <u>Napue</u> claim is easy.  *Petitioner* was the person accused with the misconduct against

7  his former girlfriend in 2000/2001.  If Ms. Matthews committed perjury with respect to those acts

8  attributed *to petitioner as having been performed against Ms. Matthews*, testified to by Ms.

9  Matthews at petitioner's 2008 trial, he surely would have known such as soon as the words left

10  the mouth of Ms. Matthews.  He cannot claim with any legitimacy that whatever the truth of Ms.

11  Matthews's misconduct testimony, petitioner was unable to judge the correctness of such facts at

12  the time he heard them in 2008—since petitioner was the one alleged to have performed them.

13  As a matter of law, and assuming that Ms. Matthews committed perjury as to some prior

14  misconduct specifics, petitioner did not use sufficient diligence, or any diligence, in seeking to

15  have that perjury rectified in a habeas corpus petition.

16    The <u>Brady</u> claim is another matter.  Assuming that the actions of the DA criminal

17  investigator, "Don," constitute actionable and material misconduct, respondent does not show, as

18  a matter of law, that petitioner herein demonstrated a lack of diligence such that the outcome in

19  <u>Ford</u> applies to his case.  First, it is one thing to presume, as was the case in <u>Ford</u>, that plea deals

20  are the norm and that a witness who is pending charges may well make a cooperation deal with

21  the prosecution.  In such a case, the defendant is placed on notice to investigate.  It is quite

22  another matter to presume that the district attorney, or his/her staff, will engage in coercive

23  misconduct to compel a reluctant witness to testify—who also gets the message through such

24  misconduct that any current charges/proceedings against the witness will be dealt with severely if

25  the testimony is not forthcoming.  Moreover, it is not the case here that the witness was living

26  with petitioner's family at the time of trial such that one might expect there to be interchange with

27  the witness and family concerning contacts with the district attorney's office.  Other than the fact

28  that petitioner knew his ex-girlfriend was to testify, and that such testimony would probably not

1   be helpful, which is not much to go on, respondent points to no information which would indicate

2   that petitioner should have known about "Don's" misconduct.  Thus, the statute of limitations

3   defense should be denied for the Brady claim.

4       This brings the discussion to the merits of the Brady claim.  The undersigned revisits for a

5   moment respondent's hearsay argument.  Respondent is correct that a silent denial by the state

6   supreme court on petitioner's new claims signifies a decision on the merits.  Harrington, 131 S.

7   Ct. at 784-785.  But a silent denial does not give a hint on the analysis that the court utilized to get

8   to the merits.  Respondent cites cases that indicate that declarations based on hearsay are not

9   sufficient for state habeas corpus petitions, and therefore, the state supreme court probably based

10  its decision on this rationale.  But it is just as likely that the state supreme court, in order to

11  obviate potential discovery which could easily remedy the hearsay, went directly to the

12  substantive merits of the Brady claim, and, as does respondent, ultimately found that claim

13  wanting.  Moreover, the state supreme court knows how to cite cases indicating that the state

14  petition contains inadmissible hearsay and therefore the petition is being denied on those

15  grounds—but it did not.  The inference to be drawn from the lack of citation is that the state

16  petition was not denied on evidentiary grounds, but on the substantive merits.  Finally, because

17  the declaration most likely contains a blend of hearsay and non-hearsay, the state supreme court

18  may well have bypassed this conundrum because the entire claim(s) lacked merit on a substantive

19  basis in any event.  Therefore, the undersigned will not deny the claim because the state petition

20  contained some hearsay in its predicate declaration.

21      The undersigned does agree with respondent's analysis on the substantive merits.  A

22  Brady claim contains three elements: "the evidence at issue must be favorable to the accused,

23  either because it is exculpatory or because it is impeaching; [the] evidence must have been

24  suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

25  Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256 (2004) (citations and internal quotation

26  marks omitted).  But it is not just any prejudice that will be sufficient to make the undisclosed

27  evidence material.  "Evidence is material only if there is a reasonable probability that, had the

28  evidence been disclosed to the defense, the result of the proceeding would have been different.  A

1    reasonable probability of a different result exists when the government's evidentiary suppression

2    undermines confidence in the outcome of the trial." Jones v. Ryan, ___ F.3d ___, ___, 2013 WL

3    5676467 at *8 (9th Cir. 2013) (citations and internal quotation marks omitted).

4         Respondent is further correct in that it is insufficient for a federal court in habeas to make

5    a materiality decision on a *de novo* basis.  Rather, the ultimate inquiry here is whether

6    "fairminded jurists" could not agree with the state supreme court decision that the alleged

7    withheld information in this case was not actionable or was immaterial.   Harrington, 131 S. Ct. at

8    786.

9         Viewed through the appropriate prism, and even accepting the facts of the Palmer

10   declaration on their face (but not its conclusions), fairminded jurists would not disagree with the

11   decision of the state supreme court that the alleged withheld evidence was either not actionable as

12   a Brady violation and/or was not material.  First, the fact that the Matthews were willing to pay

13   for sole parental rights by writing off back child support or paying or other types of restitution for

14   petitioner is hardly relevant to this case as such agreements are proffered in the family law area

15   all the time.  It also post-dated petitioner's trial, so how could it have been withheld.  Secondly,

16   the present day asserted fact-conclusion that the Matthews requested or desired that petitioner

17   stop this habeas proceeding because they were concerned about having to testify again, or that the

18   alleged "perjury" might see the light of day in Matthew's *present* criminal proceedings is

19   information that by definition was not available to the prosecutor at the time of petitioner's trial.

20   It does not qualify as Brady information at all.

21        Petitioner then attempts an allegation that the prosecution withheld undescribed "details"

22   of Ms. Matthews' drug convictions.  First, petitioner does not allege that he, or his lawyer, had no

23   idea of the "details" of Ms. Matthews' drug convictions.  No proffer as to those "details" is given

24   by petitioner.  Secondly, even if petitioner were ignorant of these unspecified details (doubtful),

25   this type of impeaching, which does not directly relate to truth or honesty, is hardly the type on

26   which the confidence of a trial result would be undermined.

27        This brings us to the alleged coercive threats from Don to Ms. Matthews—that she testify

28   in petitioner's trial, or perjury charges would be brought against her based on her statements to

1  police in 2000/2001, and that a failure to testify might give rise to complications to present

2  criminal proceedings regarding the Matthews.  That is, since Ms. Matthews told the police "X" in

3  2000/2001, she had better be willing to testify in 2008, or else.

4    The Palmer declaration does *not* contain an allegation that Don was coercing Matthews to

5  testify falsely—only that she was being coerced to testify when she would rather not testify at all.

6  Moreover, the declaration contains *no* facts that what Ms. Matthews testified to at petitioner's

7  trial concerning the 2000/2001 events was indeed false.  Further, as previously discussed, any

8  falsity of the Matthews information given in 2000/2001, if false at all, would have been known to

9  petitioner since he would have had personal knowledge of the events transpiring in 2000/2001

10  because petitioner's actions were the subject of those events.  Again, information cannot have

11  been withheld, when petitioner had total knowledge of the information allegedly withheld.

12    All that petitioner is left with as "withheld information" is the alleged coercive nature of

13  Don's interaction with Ms. Matthews *per se*.  While it is not unusual to impress upon a reluctant

14  witness that there may be penalties for failure to testify, i.e., you will be subpoenaed and

15  contempt penalties may apply if you do not show up to testify, the undersigned agrees that

16  threatening to have serious felony charges initiated as a means to get one to testify goes beyond

17  the former admonition.  But this coercion *per se* says nothing about the truth of the witness'

18  testimony, the *sine qua non* for materiality in this case.  Even if an inference could be drawn that

19  Don was actually telling Ms. Matthews that she had to testify to certain facts regardless of their

20  truthfulness, or else, as demonstrated above, petitioner would have been well equipped to counter

21  false testimony because he would have been knowledgeable of the "true" facts at the time.  The

22  coercion *per se* is not material in the Brady sense.

23    *3. Evidentiary Hearing*

24    Finally, the undersigned must discuss the potential for discovery or an evidentiary hearing

25  for the Brady claim in this case.  In short, there is none.  After Cullen v. Pinholster, ___ U.S. ___,

26  131 S. Ct. 1388 (2011), only the record before the state court may be initially considered.  Pizzuto

27  v. Blades, 729 F.3d 1211, 1216 (9th Cir. 2013).  Only if this record demonstrates a constitutional

28  error in the AEDPA sense may discovery and an evidentiary hearing take place to finally

1    determine the merits of a constitutional claim.  <u>Id.</u>; <u>see also</u> <u>Lewis v. Ayers</u>, 2011 WL2260784

2    (E.D. Cal. 2011).  If the state court was AEDPA unreasonable in not holding an evidentiary

3    hearing (or allowing discovery) based on the record before it, the federal court may allow

4    discovery and/or an evidentiary hearing.  <u>Gulbrandson v. Ryan</u>, ___ F.3d ___, ___, 2013 WL

5    5779188 *7 (9th Cir. 2013).

6        As discussed above, the <u>Napue</u> perjury claim is barred by the AEDPA limitations statute.

7    Even if it were not, petitioner went no distance before this court, or the state supreme court, in

8    presenting any facts which might demonstrate perjury on the part of Ms. Matthews.  The state

9    supreme court was not unreasonable in declining to order an evidentiary hearing, and its ruling on

10   the merits based on that record was similarly not unreasonable.

11       No different result obtains for the <u>Brady</u> claim.  What petitioner presents as a <u>Brady</u> claim

12   either is not, or the allegations were not material even assuming the hearsay allegations.  There

13   would be no point to allowing discovery and/or an evidentiary hearing, and more to the point,

14   <u>Cullen v. Pinholster</u> precludes such extra-record development because petitioner had an

15   opportunity to present what facts could be presented to the state supreme court, and the record

16   was unequivocally deficient in that regard.

17       For all of the above reasons, the newly added <u>Brady</u>/<u>Napue</u> claim is denied.

18       Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must

19   issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A

20   certificate of appealability may issue only "if the applicant has made a substantial showing of the

21   denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in this order, a

22   substantial showing of the denial of a constitutional right has not been made in this case.

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1    *VI.  Conclusion*

2          None of the claims presented by petitioner warrant habeas relief.  The entire petition, as

3    supplemented by the new Brady/Napue claims, ECF No. 33, is DENIED.  A certificate of

4    appealability should not issue in this action.

5    Dated: November 12, 2013

6                                                         /s/ Gregory G. Hollows

7                                                 UNITED STATES MAGISTRATE JUDGE